UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X
ESSEX CAPITAL CORPORATION,
a California corporation,

        Plaintiff,

  -against-

VIVEK GARIPALLI, an individual; SEQUOIA
HEALTHCARE SERVICES, LLC, a New
Jersey limited liability corporation;
WINTHROP HAYES, an individual; and
DOES 1 through 10, inclusive,

        Defendants.
---------------------------------------- X

Case No. 17-6347

**COMPLAINT**

## NATURE OF THE CASE

1. This case involves massive Medicaid fraud, gross mismanagement and diversion of corporate funds, and outright criminal conduct by Defendant Vivek Garipalli ("Garipalli") and his cohorts.

2. The victim of this colossal scam was Plaintiff Essex Capital Corporation ("Essex" or "Plaintiff") which provided $10 million of medical equipment financing to Allcare, a company controlled by Garipalli, based on materially false financial statements prepared by Garipalli.

3. But for the fraudulent financial statements—overstating income by $5.5 million and understating debts and fixed obligations—Essex would not have suffered the staggering losses in the case.

4. This scam did not end there. Garipalli diverted $2.35 million of a new $10 million credit facility from MidCap to his company Sequoia Healthcare Services in violation of Allcare's loan covenants with MidCap and agreements with Essex. The unavailability of this

vitally-needed operating capital further crippled the ailing Allcare and made it even more problematic for Allcare to stave off bankruptcy.

5.     Garipalli kept falsely reassuring Essex that Allcare had the revenue necessary to make timely and complete lease payments to Essex. At the same time that these rosy financial statements were being made, MidCap had significantly reduced Allcare's line of credit due to Allcare's pathetic performance—another material fact not divulged to Essex.

6.     Starved for operating capital, devoid of revenues, and managed by criminal con artists, Allcare filed bankruptcy on December 31, 2014. Essex's claims against Defendants are not affected by the bankruptcy.

7.     Defendants' tortious conduct cost Essex at least $10 million. This is a classic "teach them a lesson case" where hefty punitive damages are required to punish Garipalli and his cronies and deter other smooth-talking hustlers from bilking honest businessmen.

**PARTIES**

8.     Plaintiff is a California corporation in good standing that leases equipment to businesses and maintains its principal place of business in the County of Santa Barbara.

9.     Plaintiff is informed and believes, and based thereon alleges, that defendant Vivek Garipalli is, and at all material times was, domiciled in and a resident of New York. At all material times, Garipalli was a principal investor in and chief executive officer of Sequoia Healthcare LLC, which was the majority owner of Passaic Healthcare Services, LLC.

10.    Plaintiff is informed and believes, and based thereon alleges, that defendant Sequoia Healthcare Services, LLC ("Sequoia") is a limited liability company formed in New Jersey with its principal place of business in New Jersey.

11.    Plaintiff is informed and believes, and based thereon alleges, that defendant Winthrop "Win" Hayes ("Hayes," collectively with Garipalli and Sequoia, "Defendants") is, and at all material times was, domiciled in and a resident of New York. At all material times, Hayes was the President of Passaic Healthcare Services, LLC d/b/a Allcare Medical.

12.    The true names and capacities, whether individual, corporate, associate or

otherwise, of the defendants named herein as Does 1 through 10, inclusive, are unknown to plaintiff at the present time who therefore sues such defendants by such fictitious names. Plaintiff will amend this complaint to show the true names and capacities of the Doe defendants when they have been ascertained.  Plaintiff is informed and believes, and based thereon alleges, that Does 1 through 10, inclusive, were responsible in some manner for the acts and transactions hereinafter alleged and are liable to Plaintiff therefor.

13. In doing the acts alleged herein, each of the defendants was the agent, principal, employee, co-conspirator and/or alter ego of one or more of the other defendants, and acted with one or more of the other defendants' knowledge, consent and approval and/or within the course and scope of such agency, employment or conspiracy and/or as one or more of the other defendants' alter ego.  As such, each of the defendants is responsible for the liabilities of the other defendants, as alleged herein.

## JURISDICTION AND VENUE

14. Venue is proper in this District pursuant to 28 U.S.C. sections 1391(a) and (c) because this is the district in which a substantial part of the events or omissions giving rise to the claim occurred; Defendants reside in this district for venue purposes; and/or Defendants are subject to personal jurisdiction in this district.

15. This Court has personal jurisdiction over each of the defendants.  Garipalli and Hayes are both residents of New York, whereas Sequoia has agreed to consent to personal jurisdiction in the Southern District of New York.

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

17. Ralph Iannelli ("Iannelli"), Plaintiff's chief executive officer, met Hayes through Twinlab Holdings, Inc., when Hayes was employed there as the Vice President of Finance and Mergers and Acquisitions.  Thereafter, Iannelli and Hayes developed an episodic friendship.

18. Hayes subsequently became the President of Passaic Healthcare Services, LLC d/b/a Allcare Medical ("Allcare") a New Jersey-based durable medical equipment (DME) company. Allcare was largely owned by defendant Sequoia and its principal, defendant Garipalli. Through Garipalli, Sequoia funded Allcare's operations by making significant advances, thereby making defendant Sequoia a major creditor of Allcare—in addition to being its parent company and controlling shareholder.

19. In the spring of 2011, Hayes, acting on behalf of Allcare, approached Essex to obtain equipment financing for Allcare, whereby Essex provided fresh capital to Allcare by purchasing equipment from Allcare and leasing that same equipment back to Allcare under the terms of a 36-month lease. Essex was provided with a bill of sale that purported to give Essex full right, title, and interest to the equipment.

20. The first equipment leases between Essex and Allcare were signed on June 23, 2011. The relationship quickly expanded. By the end of 2014, Allcare had gone from leasing $350,000 worth of equipment from Essex to leasing approximately $10,000,000 worth of equipment from Essex.

21. For its first two leases with Essex, Allcare timely paid the rent in full. Throughout 2013, Defendants met with Iannelli in person and communicated with Iannelli and other Essex representatives by phone and by email. In these meetings and communications, Defendants represented to Iannelli that the business was on track and that as a result of hiring away the sales team from competitor Landauer Metropolitan ("Landauer"), Allcare would have $125,000,000 to $150,000,000 in projected revenue.

22. Defendants represented to Iannelli and others that hiring employees away from Landauer—and specifically its sales team—would generate millions of dollars in new business opportunities for Allcare. In reality, Allcare's acquisition of Landauer's personnel was not the result of a well-thought out business plan, but rather the result of Garipalli's personal grudge against the CEO of Clairvest—a venture capital company and majority investor in Landauer. Because Allcare was overly leveraged and Garipalli was unwilling to fund Allcare as promised,

Allcare lacked the infrastructure and working capital to take advantage of the additional sales that could have resulted from bringing additional sales teams onboard.

23. Unbeknownst to Plaintiff, in early June 2013, John Accumanno—former Director of Finance for the competing company whose employees Allcare acquired—warned Allcare management that changes in Medicare's reimbursement policy would seriously reduce the company's cash flow, and that Allcare could expect a reduction in receivables of approximately 35%. In December 2013, Accumanno prepared an analysis showing that Allcare's total debt in December 2012 was $16,378,745. Six months later, by June 2013, it had increased to over $18.6 million.

24. In order to maintain the sham that Allcare was in the black and to induce Essex to enter into additional sale and leaseback agreements, Defendants provided Essex with financial statements that Essex would later learn were falsified. These false statements did not match Allcare's internally distributed financial statements. The copies provided to Essex overstated Allcare's income by approximately $5.5 million. The fraudulent financial documents showed that Allcare's revenues were ramping up and demonstrating a high growth rate. In reality, what was ramping up were Allcare's debts and fixed obligations.

25. Unaware of the true state of Allcare's finances, Essex continued to purchase more medical equipment from Allcare and then lease it back to Allcare. By February 17, 2014, Essex and its affiliate Cornerstone Essex collectively entered into 11 leases with Allcare, totaling several million dollars. Essex, as part of its ordinary dealings with Cornerstone Essex, indemnified Cornerstone Essex for any losses in these transactions.

26. In October 2013, under the pretext of Allcare's having "outgrown" its current credit facility, Garipalli sought a larger $10,000,000 credit facility from MidCap Financial Services, LLC ("MidCap"), a middle market-focused, specialty finance firm that provides senior debt to companies across many industries. Defendants represented to Iannelli that Allcare could secure funding only under certain conditions. One such condition was that Allcare would use all of the money loaned by MidCap for the ongoing operations of Allcare and not use any of the

credit facility to pay creditors or investors.  Another condition reported to Iannelli was that Essex would have to promise to forbear in the exercise of certain rights under the equipment leases for one year.  Specifically, it would not be permitted to use valuable collection rights it was otherwise guaranteed under its leases with Allcare.

27. In furtherance of Defendants' fraudulent scheme and to induce Essex's to forbear, in or around October 2013, Garipalli executed a letter agreement on behalf of Sequoia promising not to foreclose on certain equipment leased by Essex to Allcare.

28. After coercing Essex's agreement to forbear on October 15, 2013, unbeknownst to Essex and before the ink had dried on the MidCap agreement, Garipalli claimed $2,350,000 of the MidCap funds to repay debts owed to his affiliate, Sequoia.  As a result of this demand, which Garipalli had represented was barred by the MidCap facility, Defendants caused Allcare to pay $2,350,000 to Sequoia.  These funds were directly wired by MidCap to Sequoia and were not available for the Allcare business plan.

29. In or around January 2014, Iannelli and Garipalli met at a JP Morgan Healthcare Conference in San Francisco.  During this meeting, Garipalli again reassured Iannelli that Allcare was in good financial condition and committed to continue to fund the company.

30. In April 2014—just two months after Essex had entered into its final lease with Allcare—Hayes attended a meeting with Iannelli and Todd Coffin, a debt broker from Source Capital.  In the midst of Hayes' reassurances that Allcare had the revenue necessary to make its lease payments to Essex, Hayes took a call from MidCap.  Iannelli later learned that the purpose of MidCap's call was to inform Hayes that MidCap was significantly reducing the advance on Allcare's line of credit as a result of Allcare's anemic collections.

31. Despite the undisclosed reduction of their credit source, throughout the remainder of April 2014, Defendants continued to communicate a sunny forecast of Allcare's financial state to Essex.  In meetings with Allcare executives, however, Hayes admitted that plaintiff was "screwed."

32. Once Iannelli learned that MidCap had cut Allcare's funding and confronted

Hayes with that fact, Hayes simply lied that MidCap's actions were the result of a "glitch in the system" and reassured Iannelli that there was "no problem with the receivables." When Iannelli questioned Garipalli about Allcare's anemic collections, Garipalli continued to assure Iannelli that he was going to personally make good on the lease payments if necessary to keep Allcare afloat if Essex refrained from declaring a default, which would have a devastating impact on Allcare's business. At the time, Iannelli was still unaware that Garipalli's company Sequoia had been directly paid by funds from the MidCap credit line. Defendants continuously repeated these misrepresentations, in substance and effect, in phone calls and emails to Essex.

33.     In or about June 2014, Hayes finally confessed to Iannelli that MidCap significantly reduced the line of credit because the "receivables aren't there." Though Allcare was making only intermittent payments on the leases, Hayes still continued to reassure Iannelli that Allcare needed "roughly 90 days to make everyone whole." Hayes importuned Iannelli to refrain from sending a default letter that, in Hayes' view, would make it harder to obtain the capital from other sources to make everyone whole. Iannelli agreed.

34.     Throughout the summer of 2014, Garipalli refused to put in the necessary funds to keep Allcare in business. Instead, he laid off approximately 100 of the employees that he had hired away from Landauer.

35.     In August 2014, Hayes informed Iannelli that Allcare was filing for bankruptcy and could not make any lease payments to Essex. Instead of filing for bankruptcy, however, Allcare sought additional investors. Hayes approached one creditor with the proposal that it purchase Allcare for $42,000,000 in order to save itself from a $10,000,000 loss.

36.     Though Garipalli is currently described on the website of his new company Clover Health Care Services as a "serial healthcare entrepreneur and turnaround expert," he ironically, refused to fund Allcare's portion of its employees' health insurance plan, which was provided by one of Garipalli's other health care companies—CarePoint, the predecessor company to Clover Health. As a result, the employees of Allcare were left with unaffordable, astronomical bills for medical care that was necessary for themselves and their families.

37. At the end of 2014, Iannelli sent a default letter to Garipalli and received no response to his letter or to his text messages. On December 31, 2014, Passaic/Allcare filed its petition for bankruptcy.

## FIRST CAUSE OF ACTION

(Fraud Against All Defendants)

38. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 37, above.

39. In or about June 2013, Defendants represented to Iannelli that Allcare would have $150 million in revenue. Defendants, acting in concert, presented Iannelli with false financial documents. Defendants further represented that Allcare was "on track" and represented that Allcare would in fact be able to collect its receivables.

40. In or around January 2014, Iannelli and Garipalli met at a JP Morgan health conference. During that meeting, Garipalli reassured Iannelli that Allcare was in good financial condition and that he was committed to continuing to fund the company.

41. In fact, Defendants' representations were false. Allcare did not have $150 million of projected revenues. In fact, of the receivables it did have, a substantial portion was improperly and illegally submitted to the United States government for reimbursement.

42. Defendants knew these representations were false when made. The financial books and records of Allcare showed a substantially lesser amount. Even that amount was inflated, because Defendants knew that a substantial portion did not qualify for reimbursement under the federal Medicare program and that Allcare would never collect the amounts represented to plaintiff as "receivable."

43. Defendants intended that Plaintiff would rely on the representations by extending millions of dollars in equipment lease financing to Allcare.

44. Plaintiff did in fact rely on Defendants' representations and extended millions of dollars in equipment lease in reliance thereon. Plaintiff's reliance on Defendants' misrepresentations was reasonable because of Iannelli's friendship with Hayes, the President of

Allcare, and because of the financial records and documents presented by Defendants that purported to back up Garipalli's representations.

45. As a direct and proximate result of Defendants' misrepresentations, Plaintiff leased additional millions of dollars in equipment to Allcare, of which more than $5.5 million were never recouped because of Allcare's poor financial condition that resulted in bankruptcy. The amount of Plaintiff's damages will be proved at trial, but is believed to be in excess of $7.8 million.

46. Plaintiff is also entitled to recover punitive and exemplary damages because of defendants' fraud and deceit. Defendants acted with malice, in that they intended by their conduct to cause injury, and in that the conduct was carried on with a willful and conscious disregard of plaintiff's rights.

## **SECOND CAUSE OF ACTION**

(Concealment Against All Defendants)

47. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 46, above.

48. When Defendants made representations regarding Allcare's financial position, they intentionally concealed important facts that made the disclosure deceptive. Specifically, they failed to disclose that a substantial portion of the receivables would be for charges to be submitted to the United States government under the Medicare program and that a large percentage of the receivables were for goods and services that Defendants in fact knew the Medicare program would not reimburse.

49. Likewise, Defendants knew that Allcare would use money from the MidCap financing to repay Sequoia but concealed that fact from Plaintiff when asking Plaintiff to enter into a forbearance agreement in connection with the MidCap financing.

50. Plaintiff did not know of the concealed facts.

51. Defendants intended to deceive Plaintiff by concealing the facts regarding Allcare's financial condition and the MidCap financing in order to induce Plaintiff to lease

equipment to Allcare and to refrain from enforcing Plaintiff's rights under the leases.

52. Plaintiff reasonably relied on Defendants' deception because of the friendship between Iannelli and Garipalli, because of Defendants' familiarity with the intricacies of Medicare rules and regulations, and because of Defendants' familiarity with the negotiations for the MidCap financing.

53. As a direct and proximate result of the misrepresentations made by Defendants, Plaintiff leased equipment worth millions of dollars to Allcare, of which more than $5.5 million was never recouped because of Allcare's poor financial condition that resulted in bankruptcy. The amount of Plaintiff's damages will be proved at trial but is believed to be in excess of $7.8 million.

54. Plaintiff is also entitled to recover punitive and exemplary damages because of Defendants' fraud and deceit. Defendants acted with malice, in that they intended by their conduct to cause injury, and in that the conduct was carried on with a willful and conscious disregard of plaintiff's rights.

## THIRD CAUSE OF ACTION

(Promissory Fraud Against All Defendants)

55. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 54, above.

56. In or about October 2013, Defendants, acting in concert, represented to Iannelli that Allcare had "outgrown" its existing credit facility and needed an additional $10 million in financing from a third party, MidCap Financial. Defendants stated that as a condition for Allcare's securing additional funding, Plaintiff must promise not to foreclose on its security interests. Defendants promised that Allcare would invest the entire $10 million from MidCap into Allcare and that none of it would be used to repay debtors or investors.

57. Defendants' promises were false. At the time of these promises to Iannelli, Defendants never intended for Allcare to use the money as represented. Within days of receipt of the investment of MidCap's money, and in furtherance of their conspiracy, Defendants caused

$2.35 million of that sum to be diverted to pay to Sequoia in advance of all other creditors of Allcare, including Plaintiff.

58. As a direct and proximate result of the misrepresentations made by Defendants, Plaintiff did not repossess its equipment or enforce its rights under the equipment leases at a time when it would have recovered substantial amounts of its losses on the lease agreements. The amount of Plaintiff's damages will be proved at trial, but is believed to be in excess of $7.8 million.

59. Plaintiff is also entitled to recover punitive and exemplary damages because of Defendants' fraud and deceit. Defendants acted with malice, in that they intended by their conduct to cause injury, and in that the conduct was carried on with a willful and conscious disregard of Plaintiff's rights.

## FOURTH CAUSE OF ACTION

(Breach of Contract Against Defendant Vivek Garipalli)

60. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 58, above.

61. In or around April, 2014, in response to Iannelli's inquiries about Allcare's collections, Garipalli assured Iannelli that, if Essex would refrain from declaring a default and under the defaulted leases, Garipalli was going to personally contribute the funds necessary—including payment of the leases—in order to keep the business operating, thus creating a clear, valid and enforceable contract.

62. Plaintiff accepted this offer by forbearing in declaring a default or under the equipment leases. The forbearance constituted full performance of Plaintiff's obligations.

63. Garipalli, on the other hand, breached the promise as he continually refused to put in the necessary funds to keep Allcare in business, instead laying off approximately 100 of the employees. Garipalli never put in the promised funds, and Allcare eventually filed for bankruptcy.

64. As a direct result of Garipalli's promise to put in the promised funds to keep

Allcare afloat, Plaintiff did not declare a default or exercise its rights under the equipment leases at a time when it would have recovered substantial amounts of its losses on the lease agreements. The amount of Plaintiff's damages will be proved at trial, but is believed to be in excess of $7.8 million.

## FIFTH CAUSE OF ACTION

(Promissory Estoppel Against Defendant Vivek Garipalli)

65. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 64, above.

66. In or around April 2014, in response to Iannelli's inquiries about Allcare's collections, Garipalli clearly and unambiguously promised Iannelli that he was going to personally contribute the funds to pay off Allcare's operational expenses, including its leases with Essex, which were necessary to keep the business from going under.

67. As a direct result of, and in reliance on, Garipalli's promise to put in the necessary funds to keep Allcare afloat, Plaintiff did not declare a default, sue Allcare, or otherwise enforce its rights under the equipment leases at a time when it would have recovered substantial amounts of its losses on the lease agreements.

68. Plaintiff's reliance on Garipalli's promise was both reasonable and foreseeable, as Garipalli made the promise directly in response to Plaintiff's concerns over Allcare's collections, and in order that Plaintiff not immediately repossess the equipment or take other remedial action.

69. The amount of Plaintiff's damages will be proved at trial, but is believed to be in excess of $7.8 million.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Essex Capital Corporation prays for judgment in its favor and against defendants Vivek Garipalli, Sequoia Healthcare Services, LLC, and Win Hayes on the first through fifth causes of action as follows:

1. For compensatory damages, both general and specific, in the amount of no less than $7.8 million, or such greater amount as shall be proven at trial;

2. For punitive damages in an amount sufficient to punish defendants and deter defendants and others from engaging in similar conduct;

3. For attorneys' fees and costs of suit; and

4. For such other and further relief as the Court may deem proper.

Dated: August 21, 2017

Respectfully submitted,

Locke Lord LLP

By: *s/Casey B. Howard*
    Casey B. Howard
    Jeffrey S. Kramer
    LOCKE LORD LLP
    200 Vesey St., 20th Floor
    New York, New York 10281
    T: (212) 415-8600
    F: (212) 303-2754
    choward@lockelord.com
    jkramer@lockelord.com
    *Attorneys for Plaintiff Essex Capital Corporation*