UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
Essex Capital Corporation,                          :
                                                    :
                        Plaintiff,                  :  Hon. John F. Keenan
            vs.                                     :
                                                    :  Case No. 17-cv-6347-JFK
                                                    :
Vivek Garipalli, Sequoia Healthcare Services, LLC   :
and Winthrop Hayes,                                 :
                                                    :
                        Defendants.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

LOCKE LORD LLP
Casey B. Howard
Jeffrey S. Kramer
Brookfield Place
200 Vesey St., 20th Fl.
New York, New York 10281
(212) 415-8600
choward@lockelord.com
jkramer@lockelord.com

December 22, 2017                    *Attorneys for Plaintiff Essex Capital*
New York, NY                         *Corporation*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

LEGAL ARGUMENT ..........................................................................................................9

I.      Legal Standards ....................................................................................................9

II.     Choice of Law ......................................................................................................10

III.    Essex's Claims Are Not Time-Barred ..................................................................13

        A.  Essex's Fraud Claims Are Timely ..............................................................13

        B.  Essex's Contract Claims Are Timely ..........................................................18

IV.     Essex's Claims Are Not Barred By The Agreements Submitted With The Motion ........18

        A.  The First Cause of Action is Not Barred by the Equipment Leases ..........................19

        B.  Essex's Second Cause of Action is Not Barred by the ELA ......................................21

        C.  Essex's Contract Claims Are Not Barred by the ELA ..............................24

CONCLUSION....................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**State Cases**

*Fox v. Ethicon Endo-Surgery, Inc.*,
    110 P.3d 914 (Cal. 2005) ...................................................................... 14, 15, 16

*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Ass'n*,
    291 P.3d 316 (Cal. 2013) ................................................................................ 19, 23

**Federal Cases**

*AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*,
    726 F.Supp.2d 307 (S.D.N.Y. 2010) ................................................................. 12

*Amberger v. Legacy Capital Corporation*,
    17 Civ. 532 (NRB), 2017 WL 4863093 (S.D.N.Y. Oct. 16, 2017) ...................... 13

*Bon Jour Grp., Ltd. v. Elan-Polo, Inc.*,
    No. 96 CIV. 6705 (PKL), 1997 WL 401814 (S.D.N.Y. July 16, 1997) .................. 11

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
    971 F.2d 272 (9th Cir. 1992) .............................................................................. 23

*Cantor Fitzgerald Inc. v. Lutnick*,
    313 F.3d 704 (2d. Cir. 2002) ............................................................................. 13

*Chevron Corp. v. Salazar*,
    807 F.Supp.2d 189 (S.D.N.Y. 2011) ................................................................. 11

*Ciocca v. Neff*,
    No. 02 Civ. 5067(LTS) (HBP), 2005 WL 1473819 (S.D.N.Y. June 22, 2005) .............. 12, 18

*Flum v. Dep't of Educ. of the City of New York*,
    83 F. Supp. 3d 494 (S.D.N.Y. 2015) ................................................................. 17

*Glover v. City of New York*,
    446 F. Supp. 110 (E.D.N.Y. 1978) ................................................................... 17

*Harris v. City of New York*,
    186 F.3d 243 (2d Cir. 1999) .............................................................................. 10

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) .................................................................................. 9

*Hood v. City of New York*,
    739 F.Supp. 196 (S.D.N.Y. 1990) ................................................................... 17

i

*In re Bear Sterns Companies, Inc. Securities, Derivative, and ERISA Lit.*,
 08-MDL-1963 (RWS), 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011) ...............................16

*In re South African Apartheid Litigation*,
 617 F.Supp.2d 228 (S.D.N.Y. 2009) ...................................................................... 9, 10, 15

*International Customs Associates, Inc. v. Ford Motor Co.*,
 893 F.Supp. 1251 (S.D.N.Y. 1995) ....................................................................................23

*Krock v. Lipsay*,
 97 F.3d 640 (2d Cir. 1996) ........................................................................................ 10, 11

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
 108 F.3d 1531 (2d Cir. 1997) ............................................................................................12

*MacGowan v. Barber*,
 127 F.2d 458 (2d Cir. 1941) ..............................................................................................17

*Manufacturers Hanover Trust Co. v. Yanakas*,
 7 F.3d 310 (2d Cir. 1993) ..................................................................................................20

*Merex A.G. v. Fairchild Weston Sys., Inc.*,
 29 F.3d 821 (2d Cir. 1994) ................................................................................................24

*Oppenheimer & Co. v. Trans Energy, Inc.*,
 946 F. Supp. 2d 343 (S.D.N.Y. 2013) ...............................................................................10

*Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.*,
 No. 08 CIV. 11371 NRB, 2012 WL 967301 (S.D.N.Y. Mar. 20, 2012).............................12

*Precision Orthopedic Implants, Inc. v. Limacorporate S.P.A.*,
 16-cv-2945-ODW, 2016 WL 73788878 (C.D. Cal. Dec. 20, 2016) ....................................14

*Robinson v. Deutsche Bank Tr. Co. Americas*,
 572 F. Supp. 2d 319 (S.D.N.Y. 2008) ...............................................................................20

*Ronzani v. Sanofi S.A.*,
 899 F.2d 195 (2d Cir. 1990) ..............................................................................................16

*Streit v. Bushnell*,
 424 F.Supp.2d 633 (S.D.N.Y. 2006) ..................................................................................18

*Topps Co. v. Cadbury Stani S.A.I.C.*,
 380 F. Supp. 2d 250 (S.D.N.Y. 2005) ...............................................................................14

*Turtur v. Rothschild Registry Int'l, Inc.*,
 26 F.3d 304 (2d Cir. 1994) ................................................................................................11

*Weinstein v. eBay, Inc.*,
    819 F. Supp. 2d 219 (S.D.N.Y. 2011) .................................................................................9

**State Rules**

CPLR 213(8)...............................................................................................................................14

CPLR Section 202.......................................................................................................................13

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6)...........................................................................*passim*

Federal Rule 15(c)(1)(B) ...........................................................................................................17

**State Statutes**

Cal. Code of Civ. P. § 338(d) ....................................................................................................14

N.J. Stat. § 2A:14-1 ...................................................................................................................18

Plaintiff Essex Capital Corporation ("Essex"), by and through its counsel, Locke Lord LLP, respectfully submits this memorandum of law in opposition to Defendants Vivek Garipalli ("Garipalli"), Sequoia Healthcare Services, LLC ("Sequoia") and Winthrop Hayes's ("Hayes") motion to dismiss Essex's First Amended Complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Garipalli, Hayes and Sequoia fraudulently induced Essex to provide to Passaic Healthcare Services, LLC, d/b/a Allcare Medical ("Allcare") millions of dollars of leaseback financing that the defendants knew Essex would never recover, but which Allcare desperately needed. As Essex's millions of dollars of fresh capital poured into Allcare, the defendants were covertly driving the business into the ground and funneling money out of the company. When Allcare's lease payments became sporadic, Garipalli and Hayes misrepresented Allcare's finances to Essex and concealed Allcare's poor financial health in order to keep Essex committed to providing financing. The defendants kept up the charade until it was too late for Essex to recover its money and Allcare filed for bankruptcy. It was only after the bankruptcy filing, when Essex was able to investigate Allcare's operations and communicate with Allcare's former executives and creditors, that Essex learned of the defendants' fraud.

Now, the defendants seek to shield themselves from liability by the very product of their fraud. They argue that Essex's claims are barred by the terms of the contracts which they fraudulent induced Essex to enter. They argue that Essex's claims are time-barred and, by doing so, hope to benefit from their effective concealment from Essex of Allcare's financial problems. Respectfully, the Court should not reward the defendants for their proficiency at committing

fraud.  Defendants fail to raise any argument in their motion to warrant dismissal of Essex's complaint.

First, Essex's claims are not time-barred.  Essex commenced this action within three years after Allcare filed for bankruptcy, which was the event that triggered Essex's investigation into Garipalli's and Hayes's actions and permitted Essex to discover the defendants' fraud. Accordingly, Essex's claims are timely.  However, even under the defendants' mistaken argument that Essex's statute of limitations began to run in June of 2014, Essex filed its complaint in California state court alleging these same claims in April of 2017.  This case relates back to that complaint, which Essex timely filed.

Second, none of the documents the defendants submitted with their motion preclude Essex from asserting its claims.  Contrary to the defendants' argument, merger clauses do not automatically insulate parties from liability for intentional misrepresentations meant to induce other parties into entering the contract that contains the merger clause.  Here, Garipalli and Hayes intentionally misrepresented Allcare's financials, going so far as to provide Essex with falsified financial statements in order to induce Essex to enter into the subject contracts.  The equipment lease merger clause contains a specific exception for "financial statements" provided to Essex.  Essex's claims are largely premised on false financial statements that Garipalli and Hayes provided to Essex.  Further, the clauses the defendants cite in their motion are ambiguous and this Court should not choose one interpretation over another in a motion to dismiss.  The Court should require the parties to submit evidence supporting their reading of the contract language.

Essex has properly pled claims for fraudulent inducement, breach of contract and promissory estoppel.  The defendants ultimately do not dispute that.  The affirmative defenses

argued by defendants are insufficient to merit dismissal of any claims.  The Court should deny

their motion.

## STATEMENT OF FACTS

Founded by Ralph Iannelli in 1996, Essex provides sale-leaseback financing to

companies in need of capital by purchasing the company's equipment and leasing it back to

them. (FAC ¶¶ 16-17).  In 2011, Iannelli's friend Win Hayes approached Iannelli about obtaining

sale-leaseback financing for Passaic Healthcare Services, LLC d/b/a Allcare Medical ("Allcare"),

a New Jersey-based durable medical equipment ("DME") company.  (FAC ¶¶ 17-18, 23).  Essex

had never provided sale-leaseback financing in the DME market before.  Hayes was the

President of Allcare and his job responsibilities included managing and controlling Allcare's

finances, books and records.  (FAC ¶¶ 19-20).  However, Essex would learn that Hayes did not

ultimately control Allcare.  (FAC ¶¶ 21-24).  Instead, Vivek Garipalli, the head of Sequoia

Healthcare Services, LLC, had ultimate decision-making authority over Allcare's operations.

(FAC ¶ 21-22).  Over time, Sequoia loaned millions of dollars to Allcare, making Garipalli not

just the head of Allcare's operations but also a major creditor.  (Id.).  Garipalli called the shots

and Hayes did not act on behalf of Allcare without Garipalli's knowledge or approval.  (Id.).

Garipalli and Hayes met with Iannelli in 2011 to negotiate the terms of Essex's financing

of Allcare.  (FAC ¶ 24).  The parties executed their first Commercial Lease Agreement (an

"Equipment Lease" or the "Equipment Leases") on June 23, 2011.  (FAC ¶ 25).  Over the next

year and a half, Essex and Allcare entered into five more Equipment Leases, pursuant to which

Essex provided nearly $5,000,000 of financing to Allcare.  (FAC ¶ 26).  Initially, Allcare paid its

rent and the rosy financial picture Garipalli and Hayes painted for Essex appeared accurate.

(Id.).  However, unknown to Essex at the time, Garipalli and Hayes were already taking steps that would doom Allcare.

By the end of 2012, Allcare had amassed over $16,000,000 of debt and its ability to collect on accounts receivable was diminishing.  (FAC ¶ 28).  Then, in early 2013, the government changed Medicare's reimbursement policies and the competitive bidding process by which DME companies secured Medicare and Medicaid contracts.  (FAC ¶ 29).  These changes meant that Allcare could expect a significant reduction in its expected revenue due to reduced Medicare contracts and a large part of Allcare's Medicare receivables becoming uncollectable. (Id.).  Garipalli and Hayes knew that these changes would adversely affect Allcare's bottom line. (FAC ¶ 30).  Essex did not know this.  Garipalli and Hayes also knew that the effect of the Medicare changes, combined with Allcare's dwindling ability to collect on its receivables and large debt, would pose serious problems for Allcare's financial health going forward.  (FAC ¶¶ 30, 46-47).  Essex did not know this either.  Garipalli and Hayes kept these facts from Essex.

Instead, Garipalli and Hayes presented Essex with a plan of enormous growth for Allcare. (FAC ¶ 40).  Specifically, they explained to Essex that Allcare sought to acquire Landauer Metropolitan, a large competitor in the DME space.  The Allcare-Landauer negotiations took place in 2013.  (FAC ¶ 31).  Garipalli represented Allcare—though Hayes also attended the negotiations—and Landauer was represented by its private equity owners.  (FAC ¶ 32). Problems arose during the negotiations.  Garipalli and Landauer's owners developed a personal feud and the talks turned bitter and personal.  (FAC ¶ 33).  The deal broke down and Allcare was not able to acquire Landauer.  (FAC ¶ 34).  Having failed to acquire Landauer's business, Garipalli set his sights on poaching key Landauer personnel, including high-level executives. (FAC ¶¶ 34-35).  The personnel acquisition increased Allcare's payroll by $5,000,000 with no

perceivable benefit to the company and no plan for how Allcare would cover the new expenses. (FAC ¶¶ 35-37). Garipalli's personal vendetta against the Landauer private equity group ballooned Allcare's debt and threatened the financial stability of the company. Garipalli and Hayes withheld the facts about all of these events from Essex. (FAC ¶¶ 38-42). Essex did not learn these details until after Allcare's bankruptcy.

In April of 2013, Allcare's lease payments to Essex became sporadic. (FAC ¶ 38). Iannelli expressed concern to Hayes and Garipalli about the sporadic payments. (FAC ¶ 39). They represented to him that Allcare was financially stable. (FAC ¶ 40). They told Iannelli that Allcare had just acquired key Landauer employees and executives and that the acquisition would result in $125,000,000 to $150,000,000 of revenue for Allcare. (Id.). None of this was true. Allcare did not acquire the Landauer employees as part of a competent business plan. (FAC ¶ 42). Garipalli poached Landauer's executives because of the personal grudge he developed for Landauer's owners. (Id.). Allcare's acquisition would not generate revenue for the company. Instead, it added $5,000,000 of expenses which Garipalli and Hayes had no plan to offset.

Throughout the summer of 2013, Essex continued to seek updates on Allcare's financial health from defendants. (FAC ¶ 43). In response, Hayes emailed Allcare financial statements to Essex that showed Allcare was a growing business. (Id.). Essex did not know this at the time, but these financial statements were false. (FAC ¶¶ 43-45). They did not match financial statements Allcare executives circulated among each other. (Id.). As an example, one set of financial statements Hayes sent to Iannelli overstated Allcare's income by approximately $5.5 million, an overstatement of 70%, and omitted large amounts of Allcare's bad debt. (FAC ¶ 43). Essex did not learn that these statements were fraudulent misrepresentations until after Allcare filed its bankruptcy petition, when Essex then acquired financial statements distributed internally

5

among Allcare's executives.  These internal financial statements showed Allcare's true financial situation: incredibly low income eclipsed by high bad debt.  (FAC ¶¶ 43-45).  Defendants' motive for providing false financials to Essex was evident.  Essex was providing Allcare with millions of dollars of capital through the sale-leaseback agreements.  With Allcare's collections dwindling and its debts mounting, it could not afford to lose Essex's capital flow.  (FAC ¶ 45).  Further, Garipalli and Sequoia had invested millions of dollars in Allcare and did not want to lose their investment.  Essex's lease agreements kept the lights on at Allcare.  Providing Essex with fake, artificially inflated financials guaranteed that Essex would not stop loaning Allcare money.  Defendants' plan worked.  Based on the falsified financial statements, Essex continued to enter into new lease agreements with Allcare.  (FAC ¶ 45).

One of the executives that Garipalli poached from Landauer was John Accumanno, Landauer's former CFO.  (FAC ¶ 46).  Accumanno became Allcare's CFO.  (Id.)  In summer of 2013, Accumanno reviewed Allcare's financial statements—the real ones that Garipalli and Hayes concealed from Essex—and identified numerous problems that could threaten Allcare's financial stability.  (Id.).  At a meeting with other Allcare executives, Accumanno informed Hayes and Garipalli that the Medicare changes would seriously reduce Allcare's revenue and that Allcare could expect an approximate 35% reduction in its receivables.  (Id.).  Accumanno warned Hayes and Garipalli that they had structured too much bad debt against Allcare and that the receivables reduction could exacerbate the problem.  (Id.).  Accordingly, Garipalli and Hayes knew that Allcare had serious financial issues.  They did not disclose any of this to Essex in 2013.  They continued to mislead Essex into signing new equipment leases.

Garipalli understood that Allcare was failing.  In the fall of 2013, he organized and carried out a plan to recoup the millions he had invested into Allcare through Sequoia.  (FAC ¶

48). Garipalli intentionally misrepresented to Essex—and to Allcare's executives—that he would personally inject enough capital to cover Allcare's debts. (Id.). However, he did not make those capital injections. (Id.). Instead, he sought to funnel money to Sequoia. (Id.). In October of 2013, Garipalli and Hayes told Essex that Allcare needed to increase its credit line from MidCap Financial Services, LLC ("MidCap") to $10,000,000. (FAC ¶ 49). Garipalli and Hayes knew that Allcare needed to increase the credit line because the business was failing and needed cash to cover debts. (FAC ¶ 50). However, Essex was still providing much-needed capital and the defendants did not want to signal to Essex that Allcare was in trouble. (FAC ¶¶ 51-52). Accordingly, Garipalli and Hayes misrepresented to Essex that Allcare needed the $10,000,000 because Allcare had "outgrown" its previous credit line. (FAC ¶ 50).

The defendants made other intentional misrepresentations related to the MidCap financing. Allcare was making only sporadic lease payments, at best, to Essex. Thus, Garipalli and Hayes had to ensure that Essex would not put Allcare into default under the equipment leases. (FAC ¶ 52). To stave off default or repossession of collateral under the leases, Garipalli and Hayes represented to Essex that MidCap refused to increase the credit line unless Essex surrendered its right to default Allcare. (FAC ¶ 53). The defendants also represented to Essex that MidCap conditioned the new credit line on Allcare using the money to facilitate ongoing operations. (FAC ¶ 54). They specifically represented to Essex that the MidCap money would not be used to pay Sequoia. (Id.). Essex has since learned MidCap made no such representation to the defendants. (FAC ¶ 56). Solely on the basis of these misrepresentations, Essex agreed to surrender its right to default Allcare under the leases. (FAC ¶ 55). Essex signed the Equipment Lessor Agreement ("ELA") on October 15, 2013, section six of which contained Essex's surrender of its right to default Allcare. (Id.). On or around that same day, Garipalli immediately

and covertly claimed $2,350,000 of the MidCap funds to repay debts owed to his company, Sequoia.  (Id.).  MidCap wired the funds directly to Sequoia and they were never available for use in Allcare's ongoing operations.  (Id.).  Garipalli and Hayes concealed this payment to Sequoia from Essex.  (FAC ¶ 58).  In fact, Essex did not become aware of the $2.35 million payment or the misrepresentations until after Allcare's bankruptcy, over a year and a half later.  (Id.).

Essex continued entering into equipment leases with Allcare, as the defendants continued actively misrepresenting Allcare's financial health to Essex.  (FAC ¶ 59).  In January of 2014, Iannelli and Garipalli met in San Francisco and Garipalli reassured Iannelli that Allcare was in good financial condition and that he was committed to funding the company.  (FAC ¶ 60).  Essex entered into what would be its final lease on February 17, 2014. (FAC ¶ 61).  In April of 2014, while Iannelli was in a meeting with Hayes, Hayes received word that MidCap was cutting Allcare's credit line because of Allcare's failing collections. (FAC ¶¶ 62-63).  Hayes explained this away to Iannelli by misrepresenting that MidCap was doing so because of a glitch in Allcare's internal accounting system.  (FAC ¶ 64).  Hayes intentionally withheld from Iannelli the real reason for MidCap's cut.  (FAC ¶¶ 64-65).  Throughout April of 2014, Garipalli and Hayes continued to reassure Essex that Allcare was financially stable.  (FAC ¶ 65).  However, in meetings with other Allcare executives, Hayes admitted that Essex was "screwed" and would not recover under the leases. (Id.).

In June of 2014, Hayes admitted to Essex that Allcare's receivables "weren't there." (FAC ¶ 66).  Hayes represented that Allcare needed "roughly 90 days to make everyone whole" and pleaded with Iannelli not to send a default letter that would complicate Allcare's ability to obtain other financing.  (Id.).  Garipalli did not inject the capital he had promised, but instead

8

started laying off employees, including many of the employees he had poached from Landauer just one year earlier. (FAC ¶ 67). In August of 2014, Hayes told Iannelli that Allcare would be filing for bankruptcy. (FAC ¶ 68). However, instead of actually filing for bankruptcy, Garipalli and Hayes sought new investors. (Id.). Indeed, the defendants appeared to scrap the bankruptcy plan and were actively negotiating the sale of Allcare. (Id.). Ultimately they were not able to sell Allcare. At the end of 2014, after the period defined in the ELA expired, Essex sent a default letter to Allcare. (FAC ¶ 69). On December 31, 2014, Allcare filed for bankruptcy. (FAC ¶ 70).

**LEGAL ARGUMENT**

## I.    Legal Standards

On a Rule 12(b)(6) motion to dismiss, the court must test the "legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." *Weinstein v. eBay, Inc.,* 819 F. Supp. 2d 219, 223 (S.D.N.Y. 2011) (quoting *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir. 2009)). A complaint that states a "plausible claim for relief" will survive a motion to dismiss. *Harris*, 572 F.3d at 72. Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Essex has undisputedly satisfied its pleading obligations, as evidenced by the fact that defendants do not once challenge the legal sufficiency of Essex's pleading. Instead, the defendants argue that Essex's claims are barred by the applicable statutes of limitations and by the terms of various contracts.

A statute of limitations defense is an affirmative defense that typically raises questions of fact and "normally cannot be decided on a motion to dismiss." *In re South African Apartheid Litigation*, 617 F.Supp.2d 228, 287-88 (S.D.N.Y. 2009). Plaintiffs are not required to defeat affirmative defenses in their complaint. *See id.* at 288, n. 368. Accordingly, a court can dismiss

9

a complaint under Rule 12(b)(6) based on the statute of limitations only where the complaint "clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). If plaintiff raises an equitable tolling argument, "a court must deny a motion to dismiss based on the statute of limitations unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that [the] statute was tolled." *In re South African Apartheid*, 617 F.Supp.2d at 288 (quoting *Mirman v. Berk & Michaels, P.C.*, No. 91 CIV. 8606 (JFK), 1992 WL 332238, at *2 (S.D.N.Y. Oct. 30, 1992) (Keenan, J.)).

In reviewing a motion to dismiss a breach of contract claim pursuant to Rule 12(b)(6), the Court "may interpret a contract properly before it, but it must resolve all ambiguities in the contract in the plaintiff's favor." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 347 (S.D.N.Y. 2013). When contract language is ambiguous, "its construction presents a question of fact" that "precludes summary dismissal." *Id.* at 348 (quoting *Crowley v. VisionMaker, LLC*, 512 F.Supp.2d 144, 152 (S.D.N.Y. 2007)). Ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has read the entire agreement and is familiar with industry practices and usage. *See id.*

## II.    Choice of Law

In diversity cases, "federal courts must look to the laws of the forum state to resolve issues regarding conflicts of law." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Essex's first two causes of action allege that the defendants fraudulently induced Essex to enter into certain contracts. These contracts contain choice of law provisions. (*See* Commercial Lease Agreement, Hayes Decl., Ex. A at ¶ 17; ELA, Hayes Decl., Ex. C at ¶ 10). The Equipment Leases select California law—the law of the lessor's state— and the ELA selects Maryland law. New York gives full

effect to parties' choice of law provisions, though it draws a distinction between contract claims and tort claims arising incident to the contract. *See Krock*, 97 F.3d at 645.  For a contract's choice of law provision to cover tort claims, the provision's language must be sufficiently broad to encompass the entire relationship between the contracting parties. *See id.; see also Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309 (2d Cir. 1994).  If the Court finds that the Equipment Lease's choice of law provision is sufficiently broad to cover tort-based claims, then California law would apply to Essex's first cause of action.  Similarly, if the Court finds that the ELA's choice of law provisions encompasses tort-based claims, then Maryland law would apply to Essex's second cause of action.

If the Court determines that both provisions are too narrow to cover non-contractual claims, then New York choice of law principles determine which state's substantive law applies to each cause of action.  *See Krock*, 97 F.3d at 645.[1]  Contrary to the defendants' analysis, New York applies different tests for tort claims and contract claims.  For tort claims like Essex's first two causes of action, New York applies an interest analysis that identifies which state has the greater interest.  *See id.*  The significant contacts involved in the interest analysis are the parties' domiciles and the locus of the tort. *See Bon Jour Grp., Ltd. v. Elan-Polo, Inc.*, No. 96 CIV. 6705 (PKL), 1997 WL 401814, at *4-5 (S.D.N.Y. July 16, 1997).  Where the locus of the tort is not apparent, courts look to where the party resides and where the party felt economic loss. *See id.*  Essex's California residency suggests that California law would apply to Essex's tort claims.

---

[1] The defendants' motion states that Essex has previously taken the position that California law governs its claims. (Motion at 5).  Defendants do not argue that Essex is judicially estopped from taking any contrary position in this Court, nor can they.  Judicial estoppel will only bar a party from asserting a legal position contrary to an earlier-taken position when "the party's former position has been adopted in some way by the court in the earlier proceeding." *See Chevron Corp. v. Salazar*, 807 F.Supp.2d 189, 194 (S.D.N.Y. 2011) (citing *DeRosa v. National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)).  Essex's claims have not been adjudicated by any other court and, accordingly, no court has adopted Essex's previous position.

For contract claims like Essex's third and fourth[2] causes of action, New York applies a "center of gravity" test. *See Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.*, No. 08 CIV. 11371 NRB, 2012 WL 967301, at *5 (S.D.N.Y. Mar. 20, 2012) (citing *Eagle Ins. Co. v. Singletary,* 279 A.D.2d 56, 717 N.Y.S.2d 351, 352–53 (2d Dep't 2000); *Alderman v. Pan Am World Airways,* 169 F.3d 99, 103 (2d Cir. 1999)). New York courts apply the center of gravity test to determine both which state's law governs the contract's validity and which state's law governs substantive contract interpretation. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997). This approach considers "the spectrum of significant contacts[,] rather than a single possibly fortuitous event." *Id.* (citations omitted). However, it also gives "heavy weight" to "the traditional choice of law factors," which emphasize "the place where the contract was made or was to be performed." *Pegasus*, 2012 WL 967301, at *5 (citations omitted). Courts have identified the most significant factors as being: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domiciles of the contracting parties. *See id.* (citations omitted). Here, the place of contracting was California. The places of negotiation were California and New York. The place of performance was New Jersey. The location of the subject matter of the contract was New Jersey. The parties are domiciled in California and New York. Accordingly, the Court could conceivably apply California, New Jersey or New York law to those claims.

Finally, while New York honors choice of law clauses, courts here do not consider such clauses to include a choice of that state's statute of limitations unless the contract expressly

---

[2] Promissory estoppel is an equitable doctrine that sounds in contract rather than tort. *See, e.g., Ciocca v. Neff,* No. 02 Civ. 5067(LTS) (HBP), 2005 WL 1473819, at *6 (S.D.N.Y. June 22, 2005) (citing Restatement (Second) of Contracts § 90 (1981)). As such, the "center of gravity" test is applicable. *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F.Supp.2d 307, 320 (S.D.N.Y. 2010).

choses the state's statute of limitations. *See Amberger v. Legacy Capital Corporation*, 17 Civ. 532 (NRB), 2017 WL 4863093, at * 3, n. 3 (S.D.N.Y. Oct. 16, 2017) (citing *Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416 (2010)).   Under CPLR Section 202, "a case filed by a non-resident plaintiff requires application of the shorter statute of limitations period, as well as all applicable tolling provisions, provided by either New York or the state where the cause of action accrued." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d. Cir. 2002).

## III.     Essex's Claims Are Not Time-Barred

### A.     Essex's Fraud Claims Are Timely

Essex's first two causes of action plead that the defendants fraudulently induced Essex into entering multiple Equipment Leases and the ELA by providing Essex with false financial statements and making intentional misrepresentations regarding the conditions MidCap required in order to increase Allcare's credit line.  The defendants concealed these misrepresentations from Essex throughout Allcare's entire existence.  While Essex did eventually learn before the bankruptcy that Allcare was in serious financial trouble, Essex did not learn of the defendants' various misrepresentations until Allcare's documents became available during the bankruptcy.  It was only after the bankruptcy filing that Essex could have discovered information that put it on notice that Hayes and Garipalli had been consistently lying about Allcare's financial health and the terms of the MidCap financing.  Because of information Essex obtained in the bankruptcy, Essex was finally able to investigate Allcare's books and records and interview Allcare's former employees, all of which resulted in Essex actually discovering the defendants' fraud. Accordingly, the statute of limitations on Essex's fraud claims began to run no earlier than

December 31, 2014, the day Allcare filed for bankruptcy.  Given that starting point, Essex's fraud claims are timely regardless of which state's statute of limitations this Court applies.[3]

New York's statute of limitations for fraudulent inducement is six years from the date the cause of action accrued or two years from when the fraud was discovered or could reasonably have been discovered.  *See* CPLR 213(8).  Under New York law, a fraudulent inducement claim accrues on the execution date of the contract into which the plaintiff was induced. *See Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 258 (S.D.N.Y. 2005).  Essex executed the ELA on October 15, 2013 and the last Equipment Lease on February 17, 2014. (FAC 55, 61).  Essex filed its first Complaint in this action on August 21, 2017. (ECF Dkt. No. 1).  Accordingly, Essex's fraud claims are timely under New York law because Essex filed them within six years of executing the respective contracts.

California's statute of limitations for fraud claims, including fraudulent inducement, is three years from the date that the plaintiff discovered or could have discovered, the cause of action. *See Precision Orthopedic Implants, Inc. v. Limacorporate S.P.A.*, 16-cv-2945-ODW, 2016 WL 73788878, at *4 (C.D. Cal. Dec. 20, 2016); Cal. Code of Civ. P. § 338(d).  A plaintiff has reason to discover a cause of action where he has "reason to at least suspect a factual basis for its elements." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005).  The so-called discovery rule delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. *See id.*  Ignorance of a "generic element" of the cause of action will delay accrual of that cause of action. *See id.* at 923-24.  Not surprisingly, this inquiry is highly fact-intensive and resolving the issue of when a plaintiff discovered his cause of action is "normally a question of fact." *Id.* at 922.

---

[3] The facts have not yet been developed well enough to determine under applicable law which statute of limitations applies to each of the claims. It is for this reason as well that dismissal for expiration of the statute of limitations is premature at this stage of the litigation.

The defendants contend that the statute of limitations began to run in June 2014 because it was at that time that Hayes admitted to Iannelli that Allcare's receivables were "not there." (Motion at 9).  The defendants argue that this is when Essex "learned of the alleged fraud." (Id.). This is simply not true and the defendants are reading too much into that single allegation. Hayes did not admit to Iannelli that Allcare had been financially unstable for years.  He did not say anything to suggest that he and Garipalli had been lying to Essex since 2013.  Hayes said absolutely nothing that would suggest that he had doctored financial statements.  He did not mention the $5.5 million of false income that appeared on those doctored financial statements that the defendants gave to Essex in 2013 and early 2014.  He did not state that the defendants omitted millions of dollars in bad debt from the same statements.  Importantly, Hayes did not mention that Garipalli had covertly funneled over $2,000,000 of MidCap's money to Sequoia, after Hayes and Garipalli had represented to Essex that Garipalli could not take any of the MidCap money as a condition to the loan.  Hayes did not mention that MidCap never conditioned the $10,000,000 credit line on Essex's promise to surrender its right to default Allcare.

All Hayes stated was that, at that time in June of 2014, Allcare would not be able to collect on a certain amount of its receivables.  The most that can be said of that statement is that it alerted Essex to the fact that Allcare was in real trouble in the summer of 2014.  Defendants cannot argue that Hayes' statement alone was sufficient to indicate to Essex that  defendants had been defrauding Essex for the past year and a half; particularly for purposes of a motion to dismiss.[4]  The defendants also ignore the fact that after Hayes's statement in June of 2014, the

---

[4] Essex actually discovered the defendants' fraud well after Allcare's bankruptcy commenced.  Essex did not plead the details of Essex's discovery of the fraud because Essex did not anticipate having to defeat the statute of limitations defense.  Indeed, Essex need not defeat such an affirmative defense with its pleading. *See, e.g., In re South African Apartheid*, 617 F. Supp. 2d at 288, n. 368.  If the Court cannot resolve the statute of limitations

defendants then represented to Essex that they were attempting to revive Allcare by finding new investors or a buyer willing to purchase the company. (FAC ¶ 68).

Instead, Allcare's bankruptcy filing was the key event that triggered Essex's investigation and eventual discovery of the defendants' fraud.  The bankruptcy petition signaled that Allcare was finished and that Garipalli would not be injecting the necessary capital to keep Allcare operational.  Allcare's internal records, which Essex had no access to before the bankruptcy, were first available to Essex in the bankruptcy proceedings.  Those records put Essex on notice that the financial information Essex had been receiving from Garipalli and Hayes did not match Allcare's own internal statements.  The bankruptcy allowed Essex to communicate with and obtain documents from former Allcare employees who had lost their jobs when Allcare filed its petition.  This information was crucial to alerting Essex to the general elements of its fraudulent inducement claims.

Accordingly,  December 31, 2014, the date of the bankruptcy filing, is the date on which the statute of limitations for Essex's fraud claims began to run.  However, at the very least, Essex's argument creates a question of fact that this Court cannot resolve on a motion to dismiss. If the Court has any hesitation about when Essex discovered the defendants' fraud, the parties should be permitted to submit documentary evidence and affidavit testimony on the issue.  It is more appropriately resolved on a summary judgment motion. *See Fox*, 110 P.3d  at 922.

Finally, even assuming for the sake of argument that Essex's statute of limitations began running in June of 2014, Essex still timely filed its fraud claims because this complaint relates

---

question on the parties' submissions, Essex respectfully requests that the Court allow Essex to amend its complaint to include allegations regarding its discovery of the fraud during and after the bankruptcy proceedings. *See Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint"); *In re Bear Sterns Companies, Inc. Securities, Derivative, and ERISA Lit.*, 08-MDL-1963 (RWS), 2011 WL 4357166, at *2 (S.D.N.Y. Sept. 13, 2011) ("There is a strong preference for allowing plaintiffs to amend inadequate pleadings").

back to the complaint Essex initially filed on April 27, 2017 in the Superior Court of California, Santa Barbara County.  Federal Rule 15(c)(1)(B) provides that an amended complaint relates back to the date of the original pleading when the "amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out – or attempted to be set out – in the original pleading." *See also Hood v. City of New York*, 739 F.Supp. 196, 198 (S.D.N.Y. 1990). Amendments that correct prior personal jurisdiction, subject matter jurisdiction or venue defects relate back to the filing of the original complaint, as long as the claims in the amendment arise out of the same conduct, transaction or occurrence.  *See MacGowan v. Barber*, 127 F.2d 458, 459-60 (2d Cir. 1941); *Glover v. City of New York*, 446 F. Supp. 110, 114-15 (E.D.N.Y. 1978). "[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Flum v. Dep't of Educ. of the City of New York*, 83 F. Supp. 3d 494, 498 (S.D.N.Y. 2015) (quoting *Slayton v. Am. Express Co.,* 460 F.3d 215, 228 (2d Cir. 2006)).

Here, Essex's claims in its First Amended Complaint undoubtedly arise out of the same conduct and transactions as the claims in the California state court complaint.  As the defendants' own brief admits, Essex initially filed this case in California state court with a complaint extremely similar to the original complaint Essex filed in this Court.  The defendants removed the state court case to the United States District Court for the Central District of California.  The California District Court then dismissed the complaint for lack of personal jurisdiction over the defendants.  Essex simply took that complaint and filed it in this Court.  Essex filed the California state court complaint on April 27, 2017, inside three years from June of 2014.  That

complaint gave the defendants "adequate notice within the statute of limitations" of the claims Essex now alleges against them. Accordingly, the First Amended Complaint relates back.

**B.     Essex's Contract Claims Are Timely**

Essex's third claim alleges that Garipalli breached an oral contract to contribute personal funds to maintain Allcare's operations. Essex's fourth claim alleges, in the alternative, promissory estoppel against Garipalli for inducing Essex to refrain from defaulting Allcare by promising to contribute funds to maintain Allcare's operations and then failing to do so. Such promissory estoppel claims sound in contract. *See Ciocca,* 2005 WL 1473819, at *6.

Under New York's "center of gravity" test for choice of law over contract claims, either New York or New Jersey law would apply. That is because the parties negotiated in New York, the defendants are domiciled in New York, the place of performance was to be New Jersey and the location of the subject matter of the contract was in New Jersey. Under these states' statutes of limitations, Essex's contract claims are timely.

New York's statute of limitations for breach of an oral agreement is six years. *See Streit v. Bushnell*, 424 F.Supp.2d 633 (S.D.N.Y. 2006). The contract formed in April of 2014. Accordingly, Essex's breach of contract and promissory estoppel claims are timely regardless of when the breach occurred because it has not even been six years since the contract formed.

Similarly, New Jersey's statute of limitations for breach of an oral contract is six years. *See* N.J. Stat. § 2A:14-1. Thus, Essex's contract claims are timely under New Jersey law for the same reasons that they are timely under New York law.

**IV.     Essex's Claims Are Not Barred By The Agreements Submitted With The Motion**

Defendants cannot protect themselves from fraudulent inducement claims simply because the contracts have a merger clause. This argument should be rejected outright. In fact, the merger clause found in the Lease Agreements expressly states that Essex relied on the financial

18

statements the defendants' provided.  The other provisions that the defendants cite either do not apply to Essex's claims or are too ambiguous to warrant dismissal before the parties have had a chance to submit evidence. The Court should deny the motion.

### A.      The First Cause of Action is Not Barred by the Equipment Leases

Essex's first cause of action alleges that the defendants fraudulently induced Essex to continue to enter into Lease Agreements after Allcare's payments became sporadic by providing Essex with false financial statements and making intentional misrepresentations about Allcare's financial health.  Essex expressly grounded this claim on, among other things, the financial statements that the defendants provided to Essex in connection with Essex entering into the Lease Agreements.  Essex later learned that these financial statements, and the defendants' other misrepresentations, were false.  Now, the defendants hope that the vanilla merger clause contained in each of the Lease Agreements will protect them from liability for falsifying Allcare's financial statements.  It does not.

First, as a rule, general merger clauses like the one found in the Lease Agreements do not bar fraudulent inducement claims regardless of which state's law applies.  In *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Ass'n*, 291 P.3d 316 (Cal. 2013), the California Supreme Court held that the parol evidence rule does not prevent a plaintiff from using oral statements made before entry into the contract—or pre-contractual documentary evidence—to show that the contract was obtained through fraud, even where the contract is fully integrated and even where the oral statements directly contradict express contractual terms. *Id.* at 324-25.  The *Riverisland* Court cited the "fundamental principle that fraud undermines the essential validity of the parties' agreement" to hold that the parol evidence rule "should never be used as a shield to prevent the proof of fraud." *Id.* at 324.

The same is true under New York law.  A general merger clause "does not, standing alone, preclude a claim of fraudulent inducement." *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008) (citing *Four Finger Art Factory, Inc. v. Dinicola*, No. 99 Civ. 1259, 2001 WL 21248, at *4 (S.D.N.Y. Jan. 9, 2001); *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (with regard to the merger clause, "where specificity has been lacking, dismissal of the fraud claim has been ruled inappropriate")).  A merger clause is "general" when it is, or resembles, "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made." *Yanakas*, 7 F.3d at 315.  Such a statement "is insufficient to bar a claim of fraudulent inducement." *Id.*  That is precisely the type of statement contained in the Equipment Leases.  Section 18 of the Equipment Lease states that the agreement "contains the entire agreement and understanding of the parties hereto, and neither party relies upon any other statement or representation."  (Hayes Decl., Ex. A at § 18).  In order to bar Essex's fraudulent inducement claim, the merger clause would need to have contained "specified representations" on which the parties explicitly were not relying. *Yanakas*, 7 F.3d at 315 (citing *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309 (1985).  The merger clause in Section 18 of the Lease Agreements does not contain any specific representations and therefore cannot bar Essex's claim.

Second, the merger clause does not bar Essex's first cause of action because the terms of the merger clause entitle Essex to rely on the fraudulent financial statements that the defendants provided.  The merger clause expressly creates an exception to its non-reliance language for financial statements. (Hayes Decl., Ex. A at § 18).  The clause reads, in relevant part, "neither party relies upon any other statement or representation, **except for the credit application and financial statements** or[sic] lessee and any guarantor provided in connection herewith."  (Id.)

(emphasis added).  Essex bases its first cause of action on, among other things, the financial statements that the defendants provided in order to induce Essex to enter into the leases.  Under this provision, Essex was entitled to, and did, reasonably rely on those financial statements.

The defendants appear to anticipate this point in their motion and argue that there were no fraudulent financial statements in the credit application nor any allegation that the financial statements were sent in connection with the Equipment Lease. (Motion at 14).  These arguments miss the mark.  First, this is too narrow a reading of the merger clause.  The clause does not require that the financial statements be contained within or even related to the credit application. Second, the First Amended Complaint does not simply make a passing reference to financial statements.  Essex clearly alleges that the defendants provided false financial statements in response to Essex's inquiries about Allcare's financial health and that Essex relied on those statements when it continued to enter into the leases. (FAC 38, 43-45).  These allegations, seen in the light most favorable to Essex, show that the defendants provided financial statements in connection with the leases.  Further, on a motion to dismiss, the Court must resolve all contractual ambiguities in favor of Essex.  At the very least, these arguments raise an issue of fact or contract interpretation that can only be resolved after the submission of evidence.

Because the Equipment Leases contain a general merger clause and general merger clauses do not bar fraudulent inducement claims and because the express terms of the clause permit reliance on financial statements, Essex's first cause of action is not barred by the terms of the leases.

**B.    Essex's Second Cause of Action is Not Barred by the ELA**

Essex's second claim for fraudulent inducement alleges that the defendants deceived Essex into surrendering its right to default Allcare by misrepresenting the conditions Midcap placed on its $10,000,000 credit line to Allcare.  Namely, the defendants falsely represented that

(i) MidCap would not extend the credit unless Essex surrendered its right to default Allcare and (ii) Allcare would not use the money to pay Sequoia, Garipalli's company.  Relying on these representations, Essex executed the ELA and thereby surrendered its right to default Allcare for one year from the execution date.  The defendants argue that this claim is barred by the general merger clause in the ELA and by a single line in a loan agreement to which Essex was not a party. (Motion at 10-12).  These arguments fail.

As Essex demonstrated above, under both California and New York law a general merger clause will not bar fraudulent inducement claims. *See* Section IV.A *supra*.  The ELA contains a merger clause in Section 9.8. (Modugno Aff., Ex. C at § 9.8).  Like the merger clause in the Lease Agreements, the ELA provision contains general language indicating that the ELA "constitutes the entire agreement" and "supersedes all other prior agreements and understandings, both written and oral." (Id.).  The merger clause does not contain or make reference to any specific representations or topics on which the parties may not rely.  Accordingly, for all the same reasons discussed above with respect to the Lease Agreement merger clause, the ELA merger clause also cannot bar Essex's fraudulent inducement claim based on the defendants' misrepresentations about the MidCap credit line.

The defendants also argue that the terms of the MidCap Loan Agreement bar this claim. (Motion at 11).  They pin this argument on a single phrase in that contract: "Borrowers shall use the proceeds of Revolving Loans solely for…refinancing Debt existing on the Closing Date." (Hayes Decl., Ex. B at § 4.7).  There are a number of problems with this argument.

First, even assuming that the defendants are properly interpreting this clause, under California law it does not matter that the oral representations Essex alleges contradict the terms of the MidCap Loan Agreement.  As Essex explained above, Essex is entitled to pursue

fraudulent inducement claims based on pre-contractual oral misrepresentations even where the contract is fully integrated and the representations contradict express contractual terms. *See Riverisland Cold Storage, Inc.*, 291 P.3d at 324-25.[5]  Second, Essex is not a party to and did not sign the MidCap Loan Agreement.  Essex is therefore not bound by any of the provisions of that document. *See International Customs Associates, Inc. v. Ford Motor Co.*, 893 F.Supp. 1251, 1255-56 (S.D.N.Y. 1995) (citing *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985)).  Finally, the clause the defendants cite is ambiguous.  The defendants argue that "refinancing Debt existing on the Closing Date" means that MidCap and Allcare "explicitly contemplated" Garipalli being able to funnel the MidCap money directly to his own company, Sequoia. (Motion at 11).  However, there is no evidence that Allcare was "refinancing debt" when MidCap directly wired $2.3 million to Garipalli's company.  In fact, Allcare was not involved in the transaction at all.  Essex alleges that Garipalli controlled Sequoia and that he funneled that money from MidCap to enrich himself.  Further, this transaction violates the same clause the defendants cite, which states that "[n]o portion of the proceeds of the Loans will be used for family, personal, agricultural or household use." (Motion at 11).  On a motion to dismiss, the Court must resolve all ambiguities and draw all reasonable inferences in favor of Essex.  The parties simply have not submitted enough evidence for this Court to determine what this contract clause means, what the parties intended it to mean and for what purpose Garipalli funneled the $2.3 million of MidCap money to his own company.

Because the ELA contains a general merger clause, which does not bar fraudulent inducement claims, and because the MidCap Loan Agreement does not affect Essex's claims in this case, Essex's second cause of action survives and should not be dismissed.

---

[5] The defendants cite a Ninth Circuit case to the contrary. *See Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272 (9th Cir. 1992).  However, that case predates *Riverisland* by about twenty years.  The state of California law has changed.

## C.    Essex's Contract Claims Are Not Barred by the ELA

Essex's third cause of action alleges that Garipalli breached a contract with Essex when he failed to personally fund Allcare's operations.  Essex's fourth cause of action alleges, in the alternative, promissory estoppel against Garipalli based on his legally enforceable promise to fund Allcare's operations.  The defendants attempt to sweep these claims away by pointing out that the ELA bars Essex from "repossess[ing], sell[ing], proceed[ing] to sale of realiz[ing] upon" any of the "leased property." (Motion at 15-17).  They argue that because Essex could not take any of these actions, then there was no consideration for Garipalli's promise to fund Allcare. This argument fails.

First, and most obviously, consideration is not an element of promissory estoppel.  In fact, the entire purpose of promissory estoppel is to enforce promises for which there may not have been consideration, as long as the promisee reasonably and detrimentally relied on the promise. *See Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 824 (2d Cir. 1994) ("the modern doctrine of promissory estoppel may be invoked in two situations. First, and most traditionally, the doctrine allows for the enforcement of a promise in the absence of bargained-for consideration").  Accordingly, failure of consideration is not a defense to a promissory estoppel claim and Essex has sufficiently plead each element of that claim.

Further, the defendants' interpretation of the ELA is overly broad and its terms do not create a failure of consideration that would justify dismissal of Essex's contract claim.  The ELA only limits Essex from taking certain specified actions with respect to certain carefully defined equipment.  Specifically, Essex could not "repossess, sell, proceed to sale or realize upon" any of the leased property that was either (i) in the possession of or subject to a contract with one of Allcare's patients, or (ii) generating accounts or other collateral for Allcare.  (ELA § 6). Accordingly, this provision does not prevent Essex from taking any action to recover its property

following a default.  In fact, the provision specifically contemplates "written notice" of a breach

or default and leaves open the possibility of, for instance, commencing a lawsuit against Allcare

either under the Equipment Leases or the ELA itself.  Nor does the provision prevent Essex from

repossessing or selling all of its property.  Thus, under this provision, Essex was free to repossess

or sell its property that was not subject to contracts with Allcare's patients or property that was

not generating any accounts receivable.  At this stage of the litigation, the defendants cannot

show that this type of property did not exist.  The Court must resolve all ambiguities and draw all

favorable inferences in Essex's favor.  Under the ELA, Essex was entitled to take certain actions

against certain property and Essex did not take those actions because of Garipalli's promise to

personally fund Allcare.  The third and fourth causes of action should not be dismissed.

**CONCLUSION**

For all of these reasons, Essex respectfully requests that this Court deny the defendants'

motion to dismiss Essex's First Amended Complaint, or, in the alternative, grant leave for Essex

to amend its Complaint to cure any pleading deficiencies.


December 22, 2017
New York, NY

Respectfully submitted,

Locke Lord LLP

By:   */s/ Casey B. Howard*
      Casey B. Howard
      Jeffrey S. Kramer

*Attorneys for Plaintiff Essex Capital Corporation*